# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DEVOROUS HENDRICKS,             Case No. 1:12-cv-213
       Petitioner,

                                    Barrett, J.
      vs.                           Litkovitz, M.J.

WARDEN, LEBANON           **REPORT AND**
CORRECTIONAL INSTITUTION,      **RECOMMENDATION**
       Respondent.

Petitioner, an inmate in state custody at the Lebanon Correctional Institution in Lebanon,

Ohio, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 with the

assistance of counsel. The case, which is now ripe for disposition, is before the Court on the

petition; respondent's return of writ with exhibits, including the trial transcript;[1] petitioner's

reply to the return of writ; and additional portions of the trial court record submitted by

respondent in accordance with Orders issued October 1 and December 6, 2013. (Docs. 1, 11, 14,

16, 18; *see also* Docs. 15, 17).

# I. PROCEDURAL HISTORY

## State Trial Proceedings

In October 2008, the Hamilton County, Ohio, grand jury returned a six-count indictment

against petitioner and a co-defendant, Edgar Crawford, Jr. (*See* Doc. 6, Ex. 1). Petitioner was

charged with two counts of murder in violation of Ohio Rev. Code § 2903.02(A), one count of

felonious assault in violation of Ohio Rev. Code § 2903.11(A)(2), and one count of intimidation

of a crime victim/witness in violation of Ohio Rev. Code § 2921.04(B). A firearm specification

---

[1] It is noted that the record before the Court also includes exhibits that were attached to respondent's motion to dismiss filed on May 10, 2012. (*See* Doc. 6). The motion to dismiss was denied as moot on February 6, 2013. (*See* Doc. 10).

was attached to the murder and felonious assault charges. (*Id.*).[2]

As alleged in the indictment, the charges stemmed from the murders of Patrick Peterson and Cameron Parson on or about September 23, 2007; the felonious assault of Larry DuBose on or about November 4, 2007; and the intimidation of Larry DuBose on or about February 29, 2008 in an "attempt[] to influence or hinder [DuBose], a witness in a criminal case, in the discharge of his duty." (*See id.*). The facts giving rise to the murder and felonious assault charges were summarized as follows by the Ohio Court of Appeals, First Appellate District, based on evidence presented at petitioner's trial:[3]

> Larry DuBose, Patrick Peterson, Cameron Parson[], Edgar Crawford, Jr., and others burglarized the apartment of Mario Floyd. The group apparently took nothing during the burglary. Hendricks, who was Floyd's cousin, called DuBose soon after and confronted him about the break-in. The two met, and Hendricks demanded payment—what he called a "hood tax"—in exchange for Hendricks forgoing retaliation for the break-in. DuBose paid Hendricks $100.
>
> On September 23, 2007, police responded to the scene of a double homicide. Both Peterson and Parson[] had been shot and killed. This had occurred in an apartment complex where DuBose, Peterson, and Parson[] lived.
>
> Two months later, Hendricks drove to find DuBose with a man named Antwain Lowe. Hendricks got out of the vehicle and accused DuBose of being a snitch. DuBose asked Hendricks why he had shot and killed Peterson and Parson[] when the "hood tax" had been paid. Hendricks told DuBose that the $100 had only covered him. But because Hendricks believed that DuBose was a snitch, he drew a gun and began firing at DuBose. Lowe shoved Hendricks, and Hendricks

---

[2] The grand jury charged petitioner's co-defendant, Edgar Crawford, Jr., with the separate crimes of obstructing justice in violation of Ohio Rev. Code § 2921.32(A)(4) and tampering with evidence in violation of Ohio Rev. Code §2921.12(A)(1). (Doc. 6, Ex. 1). Specifically, Crawford was charged with destroying or concealing physical evidence (i.e., clothing) pertaining to the murder charges. (*See id.*). It appears from the record that although Crawford entered a no contest plea to the two charges, he was eventually acquitted by the trial court. (*Id.*, Ex. 8, p. 2; Doc. 11, Trial Tr. 964).

[3] The Ohio appellate court summarized the facts in its direct appeal decision filed July 21, 2010. (*See* Doc. 6, Ex. 10). 28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless the petitioner rebuts the presumption by "clear and convincing evidence." Upon review of the record, it appears that the Ohio Court of Appeals mistakenly found that the victim of the felonious assault, Larry Dubose, lived with the two murder victims in the apartment building where the homicides occurred. It is undisputed that Crawford, not DuBose, was the third person who lived with the victims in the Silverton apartment. (*See* Doc. 11, Trial Tr. 21-22, 30, 272, 577; Doc. 16, Ex. E, Tr. 3). In the absence of clear and convincing evidence to rebut the Ohio Court of Appeals' other factual findings quoted below, the rest of the appellate court's findings are presumed to be correct. *See McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004).

missed DuBose. Brittany Johnson, DuBose's girlfriend, witnessed the incident.

Hendricks and Lowe got into the vehicle and left. Lowe asked what "all that" had been about. Hendricks told Lowe that DuBose was just angry because he (Hendricks) had killed Peterson and Parson[].

During the investigation of the murders, which received wide media attention, Hendricks initially agreed to turn himself in, but ultimately failed to do so. He was apprehended after he was featured on a local news program's "Wheel of Justice." During his interview, Hendricks admitted that the burglary had occurred, that he knew DuBose, Peterson, and Parson[] had been involved, that he had collected a "hood tax" from DuBose (but claimed that it was payment to keep him from going to the police), and that he and DuBose had an argument. He denied shooting a gun or shooting at anyone.

(*Id.*, Ex. 10, pp. 1-2).

Petitioner waived his right to a jury trial and elected to be tried by the court. (*Id.*, Ex. 2). Following a bench trial, the trial judge found petitioner guilty of the murder and felonious assault offenses and the firearm specifications, but acquitted him on the charge of crime victim/witness intimidation. (*Id.*, Exs. 3-4; Doc. 11, Trial Tr. 965).

Prior to sentencing, petitioner's trial counsel filed a motion for acquittal or, in the alternative, for a new trial, which was denied. (*See id.*, Ex. 5; Doc. 11, Vol. 11 Trial Tr. 975). After a sentencing hearing, the trial court issued a Judgment Entry on May 5, 2009, sentencing petitioner to an aggregate prison term of thirty (30) years to life. (Doc. 6, Ex. 6).[4]

**State Appeal Proceedings**

With the assistance of new counsel for appeal purposes, petitioner timely appealed to the Ohio Court of Appeals, First Appellate District. (Doc. 6, Ex. 7). In the brief filed by counsel on petitioner's behalf, petitioner presented three assignments of error:

1. The defendant was deprived of his fourteenth amendment right to . . . due

---

[4] Specifically, petitioner was sentenced to fifteen (15) years to life for each murder offense. (Doc. 6, Ex. 6). Petitioner was also sentenced to a 7-year prison term for the felonious assault offense and an additional, consecutive 3-year term of incarceration for the merged firearm specification attached to the felonious assault charge. (*Id.*). The sentences imposed for the murder offenses were to be served consecutively to each other, but concurrently with the sentence imposed for the felonious assault offense and accompanying specification. (*Id.*).

process and a fair trial by the prosecutor's failure to disclose a multitude of material exculpatory evidence.

2. The trial court erred to the substantial prejudice of the Defendant-Appellant by finding him guilty of felonious assault and two counts of murder when such findings were against the manifest weight of the evidence.

3. The trial court erred to the substantial prejudice of the Defendant-Appellant by Finding him guilty of felonious assault and two counts of murder based upon Evidence that was insufficient as a matter of law to support the conviction.

(*Id.*, Ex. 8).

On July 21, 2010, the Ohio Court of Appeals issued a Judgment Entry overruling petitioner's assignments of error and affirming the trial court's judgment. (*Id.*, Ex. 10).

Assisted by new counsel from the Ohio Public Defender's Office, petitioner pursued a timely appeal to the Ohio Supreme Court. (*Id.*, Ex. 11). In his memorandum in support of jurisdiction, petitioner asserted as propositions of law that (1) the "State violates a defendant's right to due process and to a fair trial when it withholds a multitude of material exculpatory evidence"; and (2) a "defendant is deprived of due process of law when the State fails to present sufficient evidence to prove guilt of all essential elements of a crime beyond a reasonable doubt." (*Id.*, Ex. 12).

On December 15, 2010, the Ohio Supreme Court denied petitioner leave to appeal and summarily dismissed the appeal "as not involving any substantial constitutional question." (*Id.*, Ex. 13).

**State Post-Conviction Proceedings**

Counsel from the Ohio Public Defender's Office who represented petitioner on appeal to the Ohio Supreme Court also filed a petition for post-conviction relief on petitioner's behalf with the trial court. (*See* Doc. 6, Ex. 14). In the petition, which was filed on February 19, 2010 during the pendency of petitioner's appeal to the Ohio Court of Appeals, petitioner asserted the

following claims for relief:

1. The State engaged in prosecutorial misconduct, by knowingly offering false testimony from a witness. Thus, Mr. Hendricks' convictions and sentences are voidable because his due process rights were violated at trial.

2. The State withheld exculpatory evidence from Mr. Hendricks. Thus, Mr. Hendricks' convictions and sentences are voidable because his due process rights were violated at trial.

(*Id.*, pp. 11, 15).

On October 28, 2011, the Hamilton County Common Pleas Court dismissed petitioner's post-conviction petition. (*Id.*, Ex.17). The court found that petitioner had "not submitted evidentiary materials demonstrating that the prosecutor knowingly offered false testimony from a witness or withheld exculpatory evidence" and concluded that the petition was "subject to dismissal for failure to support the claims made herein." (*Id.*).

Assisted by new counsel, petitioner pursued a timely appeal to the Ohio Court of Appeals, First Appellate District. (*Id.*, Ex. 18). In the appellate brief filed by counsel on petitioner's behalf, petitioner asserted as assignments of error that (1) the trial court erred to his prejudice by failing to grant post-conviction relief for prosecutorial misconduct, *Brady* violations and violations of his right to a trial by jury; (2) the trial court erred to his prejudice by failing to conduct an evidentiary hearing; and (3) the sentence imposed on an "innocent person" amounted to cruel and unusual punishment prohibited by the Eighth Amendment. (*Id.*, Ex. 19).

On July 18, 2012, the Ohio Court of Appeals overruled the assignments of error and affirmed the trial court's judgment. (Doc. 11, Ex. B). Respondent states that petitioner did not pursue a further appeal to the Ohio Supreme Court. (*Id.*, Brief, p. 2).

## Federal Habeas Corpus

The same attorney who represented petitioner in the post-conviction appeal to the Ohio Court of Appeals filed the instant habeas corpus petition on petitioner's behalf in March 2012.

In the petition, petitioner presents the following claims for relief:

**Ground One:** Hendricks was deprived of his Fourteenth Amendment right to a fair trial and due process of law by the prosecutor's failure to disclose a multitude of material exculpatory evidence.

**Supporting Facts:** The State failed to disclose to defense counsel that a witness at the crime scene was unable to identify Hendricks in a photo array. The State either destroyed or lost exculpatory evidence obtained when police confiscated Hendricks' cell phone. The State failed to disclose impeaching evidence, that being that a pit bull was confined in the bathroom of the apartment where the murder victims lived together, which was evidence that the 911 caller was lying.

**Ground Two:** The trial court erred to Hendricks' prejudice by finding him guilty of felonious assault and two counts of murder when such findings were against the manifest weight of the evidence in violation of the Fourteenth Amendment.

**Supporting Facts:** There was no physical evidence connecting Hendricks to these crimes and another person confessed to the crime. The evidence was based entirely upon the hearsay testimony of the state's witnesses.

**Ground Three:** The trial court erred to H[]endricks' prejudice by finding him guilty of felonious assault and two counts of murder based upon evidence that was insufficient as a matter of law to support the conviction in violation of the Fourteenth Amendment.

**Supporting Facts:** The testimony of the witnesses at trial was all based on hearsay and all the witnesses were shown to be incredible and have a motivation to lie.

**Ground Four:** The State engaged in prosecutorial misconduct by knowingly offering false testimony from a witness and failing to disclose material evidence[.] Thus, Hendricks' convictions and sentences are voidable because his due process rights were violated at trial in violation of the Fifth and Fourteenth Amendments.

**Supporting Facts:** The State failed to disclose that a witness at the crime scene was unable to identify Hendricks from a photo array. The State attempted to induce a witness to testify against Hendricks in exchange for a reduction in his sentence. The State failed to disclose a recording of another individual confessing to the crime. The State presented the testimony of a witness who was threatened, intimidated and coerced into giving false testimony against Hendricks.

**Ground Five:** The State withheld exculpatory evidence from Mr. Hendricks. Thus, Mr. Hendricks' convictions and sentences are voidable because his due process rights as guaranteed by the Fifth and Fourteenth Amendments were violated.

**Supporting Facts:** The State withheld a taped statement of another person

6

confessing to the commission of the crime. The State also withheld evidence that a polygraph test was admitted to a witness with information favorable to Mr. Hendricks, confirming that she was telling the truth. The witness was not called to testify at trial.

**Ground Six:** The trial court erred in failing to grant Mr. Hendricks' motion for post conviction relief in violation of his right to due process of law as guaranteed by the Fourteenth Amendment.

**Supporting Facts:** The evidence demonstrated violations of Mr. Hendrick[s'] constitutional right to a fair trial and due process of law and the trial court failed to protect those rights.

**Ground Seven:** The State and the trial court violated Mr. Hendricks['] right to a trial by jury as guaranteed by the Sixth and Fourteenth Amendments.

**Supporting Facts:** The State's failure to disclose *Brady* material deprived Mr. Hendricks the right to a trial by jury.

**Ground Eight:** The trial court erred in failing to grant a hearing on Mr. Hendricks' petition for post conviction relief, in violation of the Fourteenth Amendment guarantees of the right to due process of law.

**Supporting Facts:** Mr. Hendricks timely filed a post conviction petition alleging serious violations of his constitutional rights and alleging substantive facts with supporting evidence and the trial court denied the petition without a hearing.

(Doc. 1, pp. 6, 8, 9, 11 & "Additional Grounds For Relief").

In the return of writ filed in response to the petition, respondent contends that petitioner procedurally defaulted and has waived the claims alleged in Grounds Four through Eight. (Doc. 11, Brief, pp. 18-19). Respondent also argues that the claim alleged in Ground Two does not constitute a cognizable ground for federal habeas relief and that petitioner has not demonstrated he is entitled to relief based on the merits of the claims alleged in Grounds One and Three of the petition. (*Id.*, pp. 9-18). Petitioner's counsel has filed a brief in reply to the return of writ. (Doc. 14). The reply brief does not address respondent's procedural default argument pertaining to the claims alleged in Grounds Four through Eight of the petition, but rather is focused solely on claims asserted in Grounds One through Three of the petition. (*See id.*).

**II. OPINION**

    **A. Petitioner Is Not Entitled To Relief Based On The Claims In Grounds One Through Three Challenging The Prosecutor's Conduct And The Weight And Sufficiency Of The Evidence, Which Were Raised On Appeal To The State Courts**

In Grounds One through Three of the petition, petitioner asserts claims challenging the prosecutor's conduct and the weight and sufficiency of the evidence. (*See* Doc. 1, pp. 6, 8, 9). The three claims were presented to and considered by the Ohio courts in the state appeal proceedings.  Because the claims were fairly presented to the state courts, they are not barred from review as procedurally defaulted grounds for relief.   However, this Court's review of the claims, which were adjudicated on the merits by the state courts, is limited.

First, in this federal habeas case, the Court's review is limited to consideration of claims alleging a violation of "the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Claims based on a "perceived error of state law" fall outside the scope of the Court's review and, therefore, do not constitute cognizable grounds for federal habeas relief.  *See id.*; *see also Wilson v. Corcoran,* __ U.S. __, 131 S.Ct. 13, 16 (2010) (quoting *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991)) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions"); *Pulley v. Harris,* 465 U.S. 37, 41 (1984).

Second, to the extent that petitioner has asserted claims of constitutional error that are subject to federal habeas review, the Court must apply the deferential standard of review set forth in 28 U.S.C. 2254(d).  Under that provision, a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Otte v. Houk,* 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000)), *cert. denied*, 132 S.Ct. 1743 (2012). "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* at 599-600 (quoting *Williams,* 529 U.S. at 413).

The statutory standard, established when the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was enacted, is a difficult one for habeas petitioners to meet. *Id.* at 600. As the Sixth Circuit explained in *Otte*:

> Indeed, the Supreme Court has been increasingly vigorous in enforcing AEDPA's standards. *See, e.g., Cullen v. Pinholster,* _ U.S. _, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (holding that AEDPA limits a federal habeas court to the record before the state court where a claim has been adjudicated on the merits by the state court). It is not enough for us to determine that the state court's determination is *incorrect*; to grant the writ under this clause, we must hold that the state court's determination is *unreasonable*. . . . This is a "substantially higher threshold.". . . To warrant AEDPA deference, a state court's "decision on the merits" does not have to give any explanation for its results, *Harrington v. Richter,* _ U.S. _, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), nor does it need to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

*Id.* (emphasis in original). The Supreme Court more recently extended its ruling in *Harrington* to hold that when a state court rules against a defendant in an opinion that "addresses some issues but does not expressly address the federal claim in question," the federal habeas court must presume, subject to rebuttal, that the federal claim was "adjudicated on the merits" and thus subject to the "restrictive standard of review" set out in § 2254(d). *See Johnson v. Williams,*

9

U.S. __, 133 S.Ct. 1088, 1091 (2013).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington*, 131 S.Ct. at 786. In other words, to obtain federal habeas relief under that provision, the state prisoner must show that the state court ruling on the claim presented "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

The Supreme Court has made it clear that in assessing the merits of a constitutional claim under § 2254(d), the federal habeas court must apply the Supreme Court precedents that controlled at the time of the last state-court adjudication on the merits, as opposed to when the conviction became "final." *Greene v. Fisher*, __ U.S. __, 132 S.Ct. 38, 44-45 (2011); *cf. Otte*, 654 F.3d at 600 (citing *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)) (in evaluating the merits of a claim addressed by the state courts, the federal habeas court must "look to Supreme Court cases already decided at the time the state court made its decision"). Decisions by lower courts are relevant "to the extent [they] already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Otte*, 654 F.3d at 600 (quoting *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)). The writ may issue only if the application of clearly-established federal law is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee v. Yukins*, 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams*, 529 U.S. at 412).

The Court turns now to consider the claims presented in Grounds One through Three of

the petition in accordance with the standards discussed above for federal habeas review of state convictions.

### 1. Ground One: Prosecutorial Misconduct Claims.

In Ground One of the petition, petitioner alleges that he was denied a fair trial because the state prosecuting attorneys improperly withheld, lost or destroyed material exculpatory evidence. (Doc. 1, p. 6). Petitioner specifically contends that the prosecution (1) failed to disclose that State's witness Robert Mahl, who testified at trial about an argument he had observed by the homicide victims' apartment building on the morning of September 23, 2007, was unable to identify petitioner from a photographic array presented during the police investigation; (2) lost or destroyed exculpatory evidence contained in a cell phone used by the petitioner that had been confiscated by the police; and (3) failed to disclose that a pit bull was found confined in the bathroom of the victims' apartment, which petitioner claims would have served to show that Edgar Crawford, Jr. was lying about a 911 call he made at the scene of the murders. (*See id.*).

The Ohio Court of Appeals was the only state court to issue a reasoned decision addressing the merits of petitioner's claims, which were presented in a single assignment of error as violations of *Brady v. Maryland*, 373 U.S. 83 (1963). (*See* Doc. 6, Ex. 8, pp. 10-13). The court overruled the assignment of error, reasoning in relevant part as follows:

> In his first assignment, [Hendricks] claims that the state on three occasions improperly withheld exculpatory information in violation of the rule announced in *Brady v. Maryland*. We disagree.
>
> In the first instance, Hendricks claims that the state improperly failed to inform him that one of its witnesses could not identify him in a photo array. But the witness's inability to identify anyone in the array was not exculpatory. If the witness had identified someone else, and the state had failed to disclose this fact, *Brady* might have been implicated. Further, the witness testified at trial. There is no *Brady* violation when the information "is disclosed to a defendant in time for its effective use at trial."

The second claim is that the state failed to provide recorded cellular-phone messages that Hendricks claims contained another party's admission to the shootings. The state, at trial, did not have the information. The lead detective testified that "I don't remember any regular messages on his phone." The state suggested that Hendricks's counsel speak to the officer who had collected the information. Hendricks called that officer as a witness for the defense. But no questions were asked about phone messages containing admissions by third parties.

On this record, it is unclear if any such message existed. And if it did, Hendricks had the opportunity to explore the issue with the officer who had collected the data from the phones. Therefore, we find no *Brady* violation.

The third claim concerns the failure of the state to inform Hendricks that a pit bull was confined in the bathroom from which a witness had claimed to call 911. But, as Hendricks notes, there was no barking heard on the 911 tape. And, this information came out during the trial early enough for Hendricks to effectively use it. Further, Hendricks makes no reference to a place in the record where he raised this issue with the trial court. Therefore, we find no *Brady* violation.

(*Id.*, Ex. 10, pp. 2-3) (footnotes with citations omitted).

In *Brady*, 373 U.S. at 87, the Supreme Court held that the prosecution is required by the Fourteenth Amendment's Due Process Clause to disclose evidence in its possession that is both favorable to the accused and material to guilt or punishment. *See also United States v. Bagley,* 473 U.S. 667, 674 (1985). *Brady* did not create a broad constitutional right of discovery in a criminal case, but rather is premised on "the avoidance of an unfair trial to the accused." *Brady,* 373 U.S. at 87; *see also Bagley,* 473 U.S. at 675 & n.6-7. Therefore, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Bagley,* 473 U.S. at 675.

To establish a *Brady* violation, it must be shown that (1) the prosecution suppressed evidence; (2) the suppressed evidence was favorable to the accused; and (3) the suppressed evidence was material to guilt or punishment, "irrespective of the good faith or bad faith of the prosecution." *Moore v. Illinois,* 408 U.S. 786, 794-95 (1972); *see also Strickler v. Greene,* 527

12

U.S. 263, 281-82 (1999); *Brady,* 373 U.S. at 87; *Bowling v. Parker,* 138 F.Supp.2d 821, 880 (E.D. Ky. 2001), *aff'd,* 344 F.3d 487 (6th Cir. 2003). Evidence "favorable to the accused" includes both exculpatory and impeachment evidence. *Bagley*, 473 U.S. at 676. Evidence is "material" within the meaning of *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682; *see also Cone v. Bell*, 556 U.S. 449, 469-70 (2009). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of the trial. *Bagley,* 473 U.S. at 682; *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109-10 (1976). In determining whether withheld evidence is "material" within the meaning of *Brady*, courts must evaluate the omission "in the context of the entire record." *Id.* at 112.

The standard for determining materiality focuses on the defendant's guilt or innocence, rather than the impact of the undisclosed evidence on the defendant's ability to prepare for trial. *United States v. Phillip,* 948 F.2d 241, 249 (6th Cir. 1991) (citing *Agurs,* 427 U.S. at 112 n.20). Therefore, the principles announced in *Brady* generally apply only where there has been a complete failure to disclose and not to delayed disclosures of exculpatory information. *See O'Hara v. Brigano,* 499 F.3d 492, 502 (6th Cir. 2007) (citing *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994)). As the Sixth Circuit has explained, in light of the materiality requirement, "[i]f previously undisclosed evidence is disclosed . . . during trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure." *United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986) (citing *United States v. Holloway*, 740 F.2d 1373, 1380-81 (6th Cir. 1984)); *see also O'Hara,* 499 F.3d at 502 (citing *United States v.*

*Patrick*, 965 F.2d 1390, 1400 (6th Cir. 1992)); *Payne v. Bobby*, No. 1:11cv2446, 2013 WL 653221, at *10 (N.D. Ohio Jan. 28, 2013) (Report & Recommendation), *adopted*, 2013 WL 639053 (N.D. Ohio Feb. 21, 2013).

Furthermore, because "*Brady* is concerned only with cases in which the government possesses information which the defendant does not," *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000) (quoting *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994)), "there is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source." *Id.* (citing *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998)); *see also Doan v. Carter*, 548 F.3d 449, 460 (6th Cir. 2008).

Finally, to the extent petitioner has alleged that the State destroyed or otherwise failed to preserve evidence obtained from petitioner's cell phone, it is well-established under Supreme Court precedents that a defendant's due process rights are violated when the State either fails to preserve material exculpatory evidence or, in bad faith, fails to preserve potentially useful evidence. *See Arizona v. Youngblood*, 488 U.S. 51 (1988); *California v. Trombetta*, 467 U.S. 485 (1984); *see also Hall v. Moore*, No. 1:02cv34, 2008 WL 565788, at *3, *27 (S.D. Ohio Feb. 29, 2008) (Spiegel, J.; Black, M.J.), *aff'd*, 339 F. App'x 576 (6th Cir. 2009).

In *Trombetta*, the Court held that due process is violated, regardless of whether or not the government acted in bad faith, when the government fails to preserve material exculpatory evidence within the meaning of *Brady*. *Trombetta*, 467 U.S. at 488-89; *see also Youngblood*, 488 U.S. at 57; *United States v. Wright*, 260 F.3d 568, 570-71 (6th Cir. 2001). To establish a due process violation under *Trombetta*, it must be shown that the non-preserved evidence "both possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other

14

reasonably available means." *Trombetta,* 467 U.S. at 489; *see also Wright,* 260 F.3d at 570-71.

In *Youngblood*, 488 U.S. at 57, the Court held that "the Due Process Clause requires a different result when [dealing] with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." In such a case, involving the failure "to preserve evidence whose exculpatory value is indeterminate and only 'potentially useful' to the defendant," *United States v. Jobson,* 102 F.3d 214, 218 (6th Cir. 1996), the defendant must demonstrate that the State acted in bad faith in failing to preserve the evidence in addition to showing that the evidence both possessed an exculpatory value that was apparent before its destruction and was of such a nature that the defendant would not be able to obtain comparable evidence by other reasonably available means. *Youngblood,* 488 U.S. at 57.

Here, the Ohio Court of Appeals addressed petitioner's claims as argued by petitioner, solely as possible *Brady* violations, and therefore did not refer to *Youngblood* or *Trombetta* in considering the allegation of lost or destroyed cell-phone evidence. The state appellate court's adjudication of petitioner's claims was neither contrary to nor involved an unreasonable application of *Brady*. Indeed, upon review of the record, the undersigned concludes that it was reasonable for the state appellate court to determine that the non-disclosure of the three evidentiary items allegedly withheld, lost or destroyed by the State did not deprive petitioner of a fair trial.

First, as the Ohio Court of Appeals indicated in its direct appeal decision (*see* Doc. 6, Ex. 10, p. 3), the prosecution did disclose at trial that State's witness Robert Mahl could not identify petitioner from a photographic array shown to Mahl during the police investigation. (*See* Doc. 11, Trial Tr. 158, 161). Mahl lived near the apartment building where Peterson and Parson were murdered. He testified that on the morning of September 23, 2007, when he went outside to get

15

the newspaper, he noticed a "taller guy" arguing with a "smaller gentleman" in the driveway next to the apartment building where the murders occurred later that night. (*Id.*, Trial Tr. 152-55). Mahl said the taller man was poking his fingers like they were a gun several times into the smaller man's chest. (*Id.*, Trial Tr. 155). The taller man then walked away, passing Mahl as he continued down the street. (*Id.*, Trial Tr. 157). Mahl said that he had never seen the man before and that he could not identify him either from the photo array that was shown by the police during the pretrial investigation or in the courtroom at trial. (*Id.*, Trial Tr. 155-58, 161-62, 166). Mahl stated that he was not focused on the man's face at the time, but rather was "more looking at the body language of the guy," watching "how he was walking, if he was going to walk towards me. And if he was going to start any trouble." (*Id.*, Trial Tr. 161-62). Mahl could only recall that the man was "very thin." (*Id.*, Trial Tr. 168). Although he commented on cross-examination that petitioner "seems to have a little bit more weight to him" than the man he had observed on September 23, 2007, Mahl consistently testified that he could not be sure "one way or the other" if the man was "in the photographs or not in the photographs" or "whether or not that person [was] in the courtroom." (*Id.*, Trial Tr. 168, 170-71).

As the state appellate court recognized, the evidence that was not disclosed to the defense until trial was neither exculpatory nor impeaching because Mahl was unable to identify anyone from the photographic array shown by the police and consistently stated that his level of observation at the time of the incident was such that he could not identify the man involved in the argument by the murder victims' apartment building beyond generally recalling that he was "taller" and "very thin." In any event, even assuming that Mahl's inability to identify petitioner from the photographic array amounted to favorable evidence within the meaning of *Brady*, it was reasonable for the Ohio Court of Appeals to conclude that no *Brady* violation occurred because the information came out during Mahl's trial testimony and no showing was made that petitioner

16

was prejudiced by the delay in disclosure. *Cf. O'Hara*, 499 F.3d at 502.

Second, to the extent that petitioner claims that the State withheld evidence about a pit bull discovered confined in the bathroom of the victims' apartment by the first responders to the murder scene, it appears clear from the record that defense counsel was well aware of such evidence at the time of trial and in fact elicited testimony and often mentioned the evidence during the trial in an effort to undermine the credibility of petitioner's co-defendant, Edgar Crawford, Jr., and to establish that Crawford, not petitioner, was the person who shot and killed Peterson and Parson. Specifically, defense counsel attacked Crawford's version of events implicating petitioner in the murders by pointing out that although Crawford claimed that he made a 911 call from the bathroom where the "vicious" pit bull was confined, no barking could be heard on the audiotape of the 911 call. (*See* Doc. 11, Trial Tr. 258-59, 262, 670-71, 844, 893, 895, 918, 927-28). It is unclear from the record when the defense first learned about the pit bull. However, even assuming the information was not disclosed until trial, it was reasonable for the state appellate court to determine that no *Brady* violation occurred in the absence of any showing of prejudice from the delay in disclosure. *Cf. O'Hara*, 499 F.3d at 502.

Third, it was reasonable for the Ohio Court of Appeals to conclude that the record failed to support petitioner's claim of a *Brady* violation stemming from the loss or destruction of information contained in cell phones used by petitioner. Petitioner stated in a police interview that a phone he had used contained a recorded statement by a person identified at trial as Tamisha Bankston, essentially informing petitioner that he had been framed by others who put petitioner's "name out there," placing petitioner at the scene of Peterson's and Parson's murders. (*See* Doc. 16, Ex. B, Tr. 13-14, 58, 95; *see also* Doc. 11, Trial Tr. 540, 583).[5] At trial, Bruce

---

[5] As discussed below in more detail when addressing petitioner's claim challenging the sufficiency of evidence, *see supra* p. 35, evidence was presented at trial of a recorded conversation between Tamisha Bankston and Edgar Crawford, Jr. on April 24, 2008. (*See* Doc. 11, Trial Tr. 635-36; Doc. 18, Ex. O). It appears from the record that the substance of that conversation was disclosed to the defense prior to trial because defense counsel raised no

Plummer, the lead police investigator in the case, testified on cross-examination that he had obtained the phone; that a "forensic expert" took the messages off the phone "to save . . . for evidence"; and that the messages and phones were "with the Prosecutor's Office." (Doc. 11, Trial Tr. 579). Plummer stated that he was "not sure what exactly was on the[re] regarding messages" and that although he listened to or saw "some of the items" on the phone, like "rap tunes" and "[p]ictures of naked women," he could not recall any "regular messages on his phone." (*Id.*, Trial Tr. 579, 585-86). When asked "what happened to the messages," Plummer replied that he thought "they are still in the phone" and that he "would not have taken the sim cards out of the phone." (*Id.*, Trial Tr. 579-80). Defense counsel averred, however, that he had "received no phone calls, no messages off those phones" and that "when we saw the phones there was no sim card and not usable." (*Id.,* Trial Tr. 579).

At defense counsel's request, a sidebar conference was then held. The prosecuting attorney stated that the phones collected when petitioner made his statement to the police, around "six or so months after the offense," were not in petitioner's name and that any messages would not have been "kept that long in phones." (*Id.*, Trial Tr. 582). The prosecutor also said that petitioner was shown the phones and had "ample opportunity to review" them and that "[a]nything that was on there was on there when we got them." (*Id.*). Furthermore, another prosecuting attorney averred that petitioner was "provided the one phone call that was referenced in the [police interview] transcript . . . about a call between him and Tamisha." (*Id.*, Trial Tr. 582-83). To the extent that defense counsel also wanted to review "old messages," which could not be accessed due to missing sim cards, the prosecutor stated: "We have what we showed you. I don't know if there were or were not sim cards." (*Id.*, Trial Tr. 583). The prosecutor suggested that Silverton police officer Alan Kabakoff, who had "handled all the phones and all the phone

---

*Brady* objection when the evidence was introduced. Therefore, the undersigned assumes that petitioner was referring to another conversation between Tamisha Bankston and himself, which was recorded on a cell phone used by petitioner.

records" during the police investigation, was the person to be contacted to "find out the answer to this." (*Id.*, Trial Tr. 584). However, defense counsel did not pursue the matter any further on the record during the trial. As the Ohio Court of Appeals pointed out, although Officer Kabakoff was called as a defense witness later in the trial, no questions were asked of him about any non-disclosed or lost phone messages or any missing sim cards from phones that had been provided to the police. (*See id.*, Trial Tr. 707-48).

It was reasonable for the Ohio Court of Appeals to find "no *Brady* violation" on the basis of the trial record. Indeed, the record is unclear as to whether there was any information obtained by the prosecution from phones purportedly used by petitioner that was withheld from the defense. The prosecutors stated they provided petitioner with the one phone message from Tamisha Bankston that petitioner had referenced in his police interview. Even assuming the message was not disclosed as suggested by defense counsel during Officer Plummer's cross-examination, petitioner has not shown that Tamisha's recorded statement satisfies the "materiality" standard of *Brady* or *Trombetta*. Officer Plummer testified that one of the first witnesses he spoke with when he arrived at the scene of the homicides a few hours after they occurred was Tamisha, who was present at the scene. (Doc. 11, Trial Tr. 540). Plummer stated that he developed petitioner as a suspect as a result of that conversation because petitioner was "one of the main people she talked about." (*Id.*). Therefore, the hearsay testimony Tamisha allegedly relayed to petitioner in the phone message about being set up is suspect and certainly does not give rise to a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *See Bagley*, 473 U.S. at 682.

Furthermore, as the Ohio Court of Appeals reasonably found, to the extent that petitioner contends that a phone he had used contains other exculpatory information in the form of a recorded third-party admission, there is simply no evidence in the record of the existence of such

19

a recorded message or that the police or prosecution were aware of any such admission based on information they had obtained from the confiscated cell phones. Finally, to the extent petitioner argues that missing sim cards or other lost or destroyed messages from the phones may have been useful to the defense under *Youngblood*, petitioner has not shown that the State acted in bad faith or that such evidence possessed an apparent exculpatory value and was of such a nature that petitioner would not be able to obtain comparable evidence by other reasonably available means. *See Youngblood,* 488 U.S. at 57.

Accordingly, in sum, petitioner has not demonstrated that he is entitled to habeas relief based on the prosecutorial misconduct claims alleged in Ground One of the petition. Petitioner has not shown that "fairminded jurists could disagree" that the Ohio Court of Appeals' adjudication of the constitutional issues is contrary to *Brady* and/or *Trombetta/Youngblood* or "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See Harrington*, 131 S.Ct. at 786-87. Therefore, Ground One of the petition should be denied with prejudice.

**2. Grounds Two and Three: Weight And Sufficiency-Of-Evidence Claims.**

In Ground Two of the petition, petitioner alleges that the trial court erred to his prejudice by finding him guilty of felonious assault and two counts of murder "when such findings were against the manifest weight of the evidence." (Doc. 1, p. 7). In Ground Three, he contends that the evidence presented at trial was insufficient to support the court's findings of guilt beyond a reasonable doubt on the murder and felonious assault charges. (*Id.*, p. 8).

As an initial matter, as respondent has argued in the return of writ (*see* Doc. 11, Brief, pp. 12-13), the claim alleged in Ground Two is not cognizable in this federal habeas proceeding because it raises an issue governed solely by state law. *See, e.g., Richardson v. Smith,* No. 3:11cv1217, 2012 WL 5903986, at *17 (N.D. Ohio Oct. 30, 2012) (Report & Recommendation)

(quoting *Tibbs v. Florida*, 457 U.S. 31, 41-47 (1982)) ("claim that a conviction is against the manifest weight of the evidence is not cognizable in federal habeas corpus review" because it is "derived from purely state law whereby the state appellate court sits as a 'thirteenth juror and disagrees with fact finder's resolution of conflicting testimony' and finds that the fact finder 'clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered'"), *adopted*, 2012 WL 5903896 (N.D. Ohio Nov. 26, 2012); *cf. Nash v. Eberlin*, 258 F. App'x 761, 765 & n.4 (6th Cir. 2007) (in holding that "a state court's decision on the manifest weight of the evidence subsume[s] a decision on the sufficiency of the evidence" for purposes of procedural default analysis, the Sixth Circuit also recognized that "a manifest-weight-of-the-evidence argument is a state-law argument"). *See also* 28 U.S.C. § 2254(a); *Wilson*, 131 S.Ct. at 16; *Estelle*, 502 U.S. at 67-68; *Pulley*, 465 U.S. at 41. Only petitioner's claim challenging the sufficiency of the evidence, which is asserted as his third ground for relief, presents a due process issue subject to review by this Court.

The Ohio Court of Appeals was the only state court to issue a reasoned decision addressing petitioner's constitutional sufficiency-of-evidence claim on direct appeal. The court considered the claim in conjunction with petitioner's state-law claim challenging the weight of the evidence. (Doc. 6, Ex. 10, p. 4). The court rejected both assignments of error, reasoning in pertinent part as follows with respect to the constitutional issue:

> When an appellant challenges the sufficiency of the evidence, we must determine whether the state presented adequate evidence on each element of the offense. . . .
>
> Hendricks premises his arguments here on two points: that there was no physical evidence linking him to the crimes, and that the witnesses who testified against him, saying that he had admitted to the shootings, were not credible. In particular, he notes that Antoinette Green, Hendricks's ex-girlfriend, admitted to lying on the stand about other things. Sh[e]nee Thompson, another witness who had overheard an admission by Hendricks, was drowsy and under the influence at the time. And Antwain Lowe was also under the influence and had received a favorable plea deal from the state. Hendricks claims that the evidence overwhelmingly pointed to Edgar Crawford as the shooter.

21

Antoinette Green testified that Hendricks had admitted to shooting the victims and to shooting at DuBose. Sh[e]nee Thompson overheard Hendricks admit to the killings and heard him say that the victims deserved to be shot. DuBose testified about the burglary and about paying the "hood tax." He also testified that he had confronted Hendricks after the killings to find out why he had committed the crimes. He testified that Hendricks had told him that the $100 payment only covered him not Peterson or Parson[]. DuBose also testified that Hendricks had shot at him at the end of this confrontation, accusing him of snitching. Antwain Lowe testified to the argument between DuBose and Hendricks and to his conversation with Hendricks after he had shot at DuBose. Lowe said that Hendricks had admitted to the shootings during that conversation. Even Hendricks's interview with police corroborated many of the details of the events involved in this case, except for the actual shootings themselves.

Matters as to the credibility of evidence are for the trier of fact to decide. This is particularly true regarding the evaluation of witness testimony. We will not reverse a conviction on the manifest weight of the evidence when the trial court has chosen one credible version of events over another.

(*Id.*, pp. 4-5) (footnotes with citations to Ohio cases omitted).

The clearly-established standard of review for evaluating the merits of constitutional claims challenging the sufficiency of the evidence was established by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307 (1979). As the Supreme Court held in *Jackson*, because the Due Process Clause requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense, *In Re Winship,* 397 U.S. 358, 363-64 (1970), "the relevant question" in assessing the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319 (emphasis in original).

Under the *Jackson* standard, the State is not required to rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.* at 326. Rather, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of

the prosecution, and must defer to that resolution." *Id.*; *see also Walker v. Engle,* 703 F.2d 959, 969-70 (6th Cir. 1983). It is the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence. *Jackson,* 443 U.S. at 319. Consequently, the reviewing court is not permitted to reweigh the evidence, reevaluate the credibility of witnesses, make its own subjective determination of guilt or innocence, or otherwise substitute its opinion for that of the jury. *See id.* at 318-19 & n.13; *see also United States v. Fisher,* 648 F.3d 442, 450 (6th Cir. 2011) (citing *Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009)); *York v. Tate,* 858 F.2d 322, 329 (6th Cir. 1988) (per curiam).

"Circumstantial evidence alone is sufficient to support a conviction." *Newman v. Metrish,* 543 F.3d 793, 796 (6th Cir. 2008) (quoting *Johnson v. Coyle,* 200 F.3d 987, 992 (6th Cir. 2000)); *see also Fisher*, 648 F.3d at 450. Due process is satisfied as long as such evidence is enough for a rational trier of fact to make a permissible *inference* of guilt, as opposed to a reasonable *speculation* that the petitioner is guilty of the charged crime. *Newman,* 543 F.3d at 796-97 (and Sixth Circuit cases cited therein).

Moreover, federal habeas review of a claim challenging the sufficiency of the evidence is even further limited. As the Sixth Circuit explained in *Brown*, 567 F.3d at 205, the federal habeas court is "bound by two layers of deference to groups who might view facts differently than [the habeas court] would." The federal habeas court must defer not only to the trier of fact's findings as required by *Jackson*, but under 28 U.S.C. § 2254(d), must also "defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Id.* (emphasis in original); *see also Davis v. Lafler,* 658 F.3d 525, 531 (6th Cir. 2011), *cert. denied*, 132 S.Ct. 1927 (2012); *Anderson v. Trombley*, 451 F. App'x 469, 474-75 (6th Cir. 2011), *cert. denied*, 132 S.Ct. 1152 (2012). Therefore, as the Sixth Circuit went on to emphasize in *Brown*:

> [W]e cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt. We cannot

23

even inquire whether *any* rational trier of fact would conclude that petitioner . . . is guilty of the offenses for which he was charged. Instead, we must determine whether the Ohio Court of Appeals itself was unreasonable in *its* conclusion that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial.

*Brown,* 567 F.3d at 205 (emphasis in original).

Applying the double-layer deferential standard to the case-at-hand, the undersigned is convinced that the Ohio Court of Appeals' sufficiency determination is neither contrary to nor an unreasonable application of *Jackson*.

First, it was reasonable for the Ohio Court of Appeals to conclude that sufficient evidence was presented at trial to support the court's finding that petitioner was guilty beyond a reasonable doubt on the felonious assault charge. The elements of the offense charged in Count Three of the indictment (*see* Doc. 6, Ex. 1), which the State was required to prove beyond a reasonable doubt, were that petitioner "knowingly caused, or attempted to cause, physical harm" to Larry DuBose "by means of a deadly weapon or dangerous ordnance, to wit: A FIREARM" on or about November 4, 2007. *See also* Ohio Rev. Code § 2903.11(A)(2). Three eyewitnesses to the incident—Brittany Johnson, Larry DuBose and Antwain Lowe—all testified that petitioner, who goes by the name "Gump," pointed and fired a gun at DuBose during a confrontation between petitioner and DuBose on November 4, 2007. (*See* Doc. 11, Trial Tr. 178-85, 430-35, 459-60, 470-76). Petitioner also admitted to the police that he was involved in an altercation with DuBose on November 4, 2007 and that a gun was fired during their argument, although it was his position that Lowe was the one who shot the gun in the air. (*See* Doc. 16, Ex. B, Tr. 25-26, 45-48).

To the extent that petitioner has contended that the eyewitnesses' testimony lacks evidentiary value because the credibility of each of those witnesses was effectively undermined at trial, the Ohio Court of Appeals properly determined in accordance with *Jackson*, 443 U.S. at

24

318-19, that the witnesses' credibility was an issue "for the trier of fact to decide," not the

reviewing court. (*See* Doc. 6, Ex. 10, p. 5). In any event, it was reasonable for the Ohio Court of

Appeals to conclude under the applicable standard set forth in *Jackson*, 443 U.S. at 319, that

after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact

could have inferred from the testimony of the three eyewitnesses that contrary to petitioner's

own self-serving version of events, petitioner aimed and fired a gun at Dubose during their

altercation on November 4, 2007. The trier of fact could have also reasonably determined in

light of that finding that petitioner knowingly attempted to cause physical harm to DuBose and,

therefore, was guilty beyond a reasonable doubt of the felonious assault offense charged in

Count Three of the indictment.

The sufficiency of evidence supporting petitioner's murder convictions poses a closer

question. As petitioner has pointed out (*see* Doc. 14, p. 8), the police did not discover any

forensic evidence during their investigation of the case to establish petitioner's presence at the

scene of the homicides. (*See* Doc. 11, Trial Tr. 800-01, 805). In contrast, the record of cell

phone calls made by Edgar Crawford, Jr. on the night of the murders, including 911 calls from

the murder victims' apartment, established Crawford's presence at the scene. (*See id.*, Trial Tr.

802, 811-12). Moreover, Crawford made a few incriminating statements during the course of the

police investigation, which petitioner contends points to Crawford rather than himself as the

culpable party. However, upon review of all the evidence presented at trial in the light most

favorable to the prosecution as required by *Jackson*, 443 U.S. at 319, the undersigned concludes

that the state appellate court did not unreasonably apply *Jackson* in upholding the petitioner's

murder convictions. Enough evidence was presented through the testimony of the various

witnesses, including Crawford, to support the reasonable inference that Crawford was not the

guilty party and, conversely, that petitioner was the person who shot and killed Peterson and

Parson. Indeed, the undersigned concludes that a rational trier of fact could have determined that the forensic evidence was consistent with and supported the version of events that Crawford eventually relayed to the police as being a truthful account of the events he witnessed on the night of September 23, 2007.

Silverton police officer Charles Roelker was the first to arrive at the scene of the murders around 11:45 p.m. on September 23, 2007 in response to a 911 call at 11:44 p.m. from Herman Wallace, a resident of the apartment building, who first reported a loud fight "going on" inside the hallway of the apartment building and then a couple of shots fired that ended the fight. (*See* Doc. 11, Trial Tr. 212, 214, 218, 563; *see also* Doc. 18, Ex. K-L). Roelker first discovered Pat Peterson lying on the floor at the base of the stairs just inside the entrance into the apartment building. (Doc. 11, Trial Tr. 215, 222). Roelker noticed a great deal of blood on the floor around Peterson and "blood smears going down the hall to the basement," as well as "blood smears going up to the stairs to the second floor." (*Id.*, Trial Tr. 217). Peterson was still breathing, but died by the time he reached the hospital. (*Id.*, Trial Tr. 217, 372). Roelker next walked outside to the back of the apartment building and discovered Cameron Parson "sitting on the steps going towards the basement door" with a gunshot wound to the left side of his head. (*Id.*, Trial Tr. 219-20). Roelker stated that there "did not appear there were any signs of life, just looking at him." (*Id.*, Trial Tr. 220). Roelker said that Parson had one shoe on his foot and that his other shoe was next to his body on the ground. (*Id.*, Trial Tr. 236).

Dr. Obinna Ugwu, who performed the autopsies of the two victims, testified that Parson, who was 16 years old at the time of his death, suffered two gunshot wounds—one to the left side of his head and one to his right chest. (*Id.*, Trial Tr. 358). Ugwu testified that because it did not appear that a major vessel was lacerated by the gunshot wound to Parson's chest, the injury would not have "immediately caused a large amount of bleeding that would have been . . .

26

observed externally." (*Id.*, Trial Tr. 368). Ugwu observed a large amount of internal bleeding into Parson's chest cavities, however, and opined that the gunshot wound to Parson's chest "probably c[a]me first" because the gunshot injury to Parson's brain likely immediately caused Parson's "heart to stop beating" and thus unable "to pump out blood into the chest cavities." (*See id.*, Trial Tr. 361, 363-64). Ugwu testified that Peterson, who was 18 years old at the time of his death, suffered two gunshot wounds, either of which could have caused his death—one to the right lower face and one to the left side of the head slightly above the front left ear. (*Id.*, Trial Tr. 372, 374-75, 377, 379). Peterson also suffered a third wound, which Ugwu described as a "grazing aberration," on the right forehead that could have been caused by a "projectile just grazing the forehead." (*Id.*, Trial Tr. 378).

During the police investigation, it was discovered that Peterson and Parson were residing with Edgar Crawford, Jr., in the basement apartment of the building where the homicides occurred. The door to the apartment was "found to be locked." (*Id.*, Trial Tr. 225-26). The keys to the apartment were later discovered in a "slatted door" storage area located in the hallway between the open basement area and the victims' apartment. (*Id.*, Trial Tr. 238).

Crawford, whose nickname is "Shytown," was 16 years of age when Peterson and Parson were killed. Facing criminal charges stemming from the murders of tampering with evidence and obstructing justice, he exercised the Fifth Amendment privilege against self-incrimination and refused to testify when called as a defense witness. (*Id.*, Trial Tr. 687-89). However, various statements that he made to the police and others during the course of the police investigation were introduced into evidence "collectively" as Court's Exhibit No. 1, as well as through the testimony of certain police officers. (*See id.*, Trial Tr. 678, 689-94).[6]

_____

[6] Some of the statements contained in Court's Exhibit No. 1 were recorded. The judge, who was the fact finder, stated that she had listened to four of Crawford's recorded police interviews (on September 30, 2007, in November 2007, and on May 15 and July 24, 2008), as well as a recorded conversation on April 17, 2008 between Crawford and Cameron Parson's father, Todd Johnson. (*See* Doc. 11, Trial Tr. 690). She mentioned that she had

Thomas Hickey, a Silverton police officer who was called as a defense witness, testified that he apprehended Crawford the day after the murders when Crawford's father was bringing his son to the police station and called for assistance in facilitating his son's arrest. (*Id.*, Trial Tr. 700-01). Hickey arrested Crawford as he was attempting to flee. Crawford was brought to the Silverton police station, where he was interviewed by the lead investigator in the case, Bruce Plummer, and Silverton Police Chief Michael Daudistel prior to his transfer to the Hamilton County Juvenile Detention Center. (*Id.*, Trial Tr. 701-02).

Daudistel testified that he first observed Crawford "banging his head against the wall," saying that "he was going to die, either he was going to die in jail, if he was in jail, or he was going to die if he was out of jail." (*Id.*, Trial Tr. 792). During the interview that followed, Crawford made statements suggesting that he wanted "to die before someone else kills him." (*Id.*, Trial Tr. 815). The interview was not recorded, and it is difficult to discern from the record exactly what Crawford told the police at that time, except that he initially denied he was present at the scene of the homicides. (*See id.*, Trial Tr. 622, 794). Crawford also apparently "made a number of comments referencing" petitioner as a person possibly connected to the murders and mentioned that "there was some dispute" with petitioner "over that breaking into the house." (*Id.*, Trial Tr. 816-17). Crawford said "you won't find a gun, but may be you will." (*Id.*, Trial Tr. 804-05).

The next statements that Crawford made were to Officer Hickey a few hours later during the processing of paper work at the Juvenile Detention Center, where Crawford was placed in custody. Crawford asked Hickey if "he was being charged with murder." (*Id.*, Trial Tr. 703).

---

not heard three additional statements by Crawford. (*Id.*, Trial Tr. 691). However, testimony was introduced about his initial police interview on September 24, 2007, which was not recorded due to a malfunctioning of the recording equipment, and two unrecorded statements that Crawford made in October 2007 in the presence of a detective with the Hamilton County Prosecutor's Office. (*Id.*, Trial Tr. 618-22, 791-805, 815-18, 831-53). Respondent has provided the Court with the recordings of Crawford's May 15, 2008 police interview and conversation with Todd Johnson on April 17, 2008, as well as with transcripts of the April 17, 2008 conversation and Crawford's police interviews on September 30, 2007, November 30, 2007 and July 24, 2008. (*See* Doc. 16, Exs. D-G; Doc. 18, O-P).

When Hickey responded "no, . . . not at this time," Crawford then said "that's probably because you guys don't have any evidence against me. Although, I guess you could find some." (*Id.*). Crawford also said "that's because revolvers are a bitch." (*Id.*).

In the recorded police interview that was held a week later on September 30, 2007, Crawford first insisted that he was not present at the scene of the double homicide, but eventually admitted he was there when confronted with evidence of a 911 call he made in which he could be heard saying "he ain't bleeding, he ain't bleeding, he ain't bleeding." (*See* Doc. 16, Ex. F, Tr. 7-8, 15-18; *see also* Doc. 18, Ex. K). Crawford agreed at that point to be a witness. (Doc. 16, Tr. 19). He initially refused to admit that anyone died in front of him and said only that he was locked outside of the apartment and ran when he heard gunshots while knocking on the window to be let in. (*Id.*, Tr. 21-24). However, as the interview progressed, Crawford said "Gump" was there. (*Id.*, Tr. 26). Crawford expressed concern about being killed by one of Gump's "boys" for talking to the police. (*Id.*, Tr. 33). He then went on to relay that he did not see anybody getting shot and that he called the police when he was outside serving a "dope fiend" and discovered Parson shot, but alive, lying on the stairs or ground at the back of the apartment building. (*Id.*, Tr. 34-36, 39). Crawford said that he pulled Parson up onto the stairs and took off running when he saw Gump or a light-skinned man he thought was Gump exit the building and come toward them. (*See id.*, Tr. 37-38, 41-46, 73). Crawford stated that he heard a gunshot as he was running away. (*Id.*, Tr. 37). He said that he did not know where Peterson was or what happened to Peterson and asked where the police had found his body. (*Id.*, Tr. 35, 89).

Crawford explained that he initially said he was not at the apartment at the time of the murders because he was "scared" and "still scared for my damn life." (*Id.*, Tr. 90). When asked what he thought about Gump, Crawford responded:

> He crazy. He came in [Tamisha's] house one time, and he took a . . . .38 revolver from us, and he slapped Cameron with a gun. He took a .38 revolver from him

29

and slapped Cameron with the gun and told Cam something about you got to have my money. He told us we had to have his money or whatever, because [Cameron] broke in . . . his cousin's [Mario Floyd's] house in Winton Terrace.

(*Id.*, Tr. 52-53). When later asked whether "Gump was mad at you guys about breaking into this house," Crawford said "[y]eah" and that Gump "wanted us to pay him" a total of $400 for "breaking in there." (*Id.*, Tr. 60). Crawford stated that he, Parson, "L," and "some girl" were the persons Gump "wanted this money from." (*Id.*, Tr. 61).

McKinley Brown, the Chief Detective at the Hamilton County Prosecutor's Office, testified about Crawford's next statements, which were made in Brown's presence in October 2007. Brown first spoke with Crawford on October 5, 2007. (Doc. 11, Trial Tr. 831). Brown testified in pertinent part as follows about what was said in that interview:

> I asked him . . . if he was present during the double homicide that occurred. . . .
> And he acknowledged that he was there. I asked him if he could tell me what had happened. Well, he went on to tell me about his friends. An individual by the name of Cam, another individual by the name of Pat, that they were staying, I think at Pat's, a place that Pat's grandmother had furnished for them. . . . They were staying at an apartment . . . in Winton Terrace with a girl by the name of Tamisha. They left there because an individual was looking for them because some money owed.
>
> He got into the reason they left because they had broke into a house or an apartment owned by an individual by the name of Mario. And Mario was, according to Edgar, his people or people were related to Gump. But he used the term people. But this individual Gump had placed a tax for them breaking into this house. He didn't say exactly tax, but since they broke into the house, they owed him a hundred dollars.
>
> ****
>
> He said the night of the shooting that he, Pat, and Cam were inside the apartment. And there was a knock on the door. He said Cam went to the door and when Cam opened the door, an individual came in. He described this individual initially as about 6' 1", about 200 pounds. Light complected. He said maybe lighter than myself with braids. He said the individual came in and said, where's my money. And backed Cam back up to[] couch. . . . At gunpoint. And [Crawford] said, . . . that he was very well versed and very familiar with firearms, and . . . that . . . [the other individual] had a revolver. He asked where his money was and shot Cam in the chest, and at some point either prior to shooting Cam or just after shooting Cam, he made the statement to Edgar, whose nickname is Shytown, you're okay

30

man, you're cool.

And Edgar said at some point he asked if it was okay to go into the restroom. He stated he went into the restroom, and when he went into the restroom, he had his cell phone and dialed 911.

He came out of the restroom after dialing 911. He gave some information about an individual that had been shot. And he came out of the restroom with the phone still opened. And down behind his leg, by his thigh, and so that the police communications could still hear what was going on. . . . I had listened to the 911 tape . . . [a]nd there was on the 911 tape, you can hear an individual saying, well, he's not [blee]ding.

And I asked him about that. I thought the statement that he made and he indicated that when I looked at him[,] there was no blood coming from his chest, but . . . he knew that he had been shot. . . .

At that point he said that the gunman made he and Pat drag Cam outside. They were at the lower level outside the apartment, to the back of the apartment. . . . And they dragged Cam out there, and he indicated that he made, the gunman made Pat lock the door as they left and threw the keys into the storage area.

Once out at the back landing, he stated that the gunman pointed . . . the gun at Cam's head, and when he pointed the gun at Cam's head, Pat seeing it, turned and ran back inside the apartment building around by their apartment. And when Pat ran the gunman turned and went after Pat. He said at that point, Edgar did, he had been almost outside the door, jumped the wall and fled. As he ran away, he said he heard several shots. Possibly three to four shots. He's not certain how many.

(*Id.*, Trial Tr. 832-36).

Brown testified that Crawford also indicated in that interview that "he had given Gump a

9-millimeter . . . Hi Point pistol as his payment." (*Id.*, Trial Tr. 838). When asked whether

Crawford actually named Gump as the shooter when talking about the homicide, Brown

responded:

Initially, he would indicate that an individual, the individual came in, he described him. And during the interview, he would say, the guy with the mask. He first said the guy had a mask over his nose and mouth and braids. And every other -- when he said – referred to that individual, he would say Gump. And then he said, oh, no, I don't want to say Gump. I don't want to say Gump. I mean a guy that looked like Gump. In the end he would tell me to make sure to take that out of there. Just say the guy with the mask. I don't want to say Gump. But he said Gump numerous times during the interview.

(*Id.*, Trial Tr. 839).

On October 8, 2007, Brown spoke with Crawford a second time. In that conversation,
Crawford indicated that he wanted to "do something" because one of the murder victims was
"very dear to him and really at that age took him under his . . . wing and did a lot for him." (*Id.*,
Trial Tr. 840). Brown allowed Crawford to use his cell phone to call one of Cameron Parson's
relatives and listened to Crawford relay to that person "exactly what happened, who did the
shooting." (*Id.*, Trial Tr. 840-41). Brown testified that Crawford said that "Gump had c[o]me in
and did the shooting and what had happened that night." (*Id.*, Trial Tr. 841). The trial judge
asked Brown if what Crawford said on October 8th had "change[d] in any way from what he had
already told you." (*Id.*, Trial Tr. 843). Brown replied:

> No, not really. When he initially talked to me, your Honor, he would refer to an
> individual with a mask that came in and did the killing and sometimes he'd forget
> to say the guy with the mask and he would say Gump.

(*Id.*).

Crawford was next interviewed on November 30, 2007 by Plummer and Daudistel of the
Silverton Police Department. In that interview, which was recorded and transcribed, Crawford
stated that the first two times he talked with the police, "I just said some bull to stop people from
talking to me, because I didn't know what to do." (Doc. 16, Ex. D, Tr. 11). He indicated that the
"third story" he had told "Mack" Brown essentially relayed "what happened" on the night of the
murders, but that he did not want "to talk to nobody no more" because after he told Brown "what
happened, [n]ext thing I know I got people telling me I'm snitching" and "they going to do
something to me when I get out." (*See id.*, Tr. 3-6, 30). Crawford said: "People trying to kill
me because I told the story, and I told who really did it." (*Id.*, Tr. 20). He specifically
mentioned that he had received a threatening letter from Tamisha. (*Id.*, Tr. 6-8). He also stated
that he was "scared" because other individuals identified as "Gump's family members," who

were in juvenile custody with him, had made the following threat when walking past him in the

hallway: "I'm going to get you. I'm going to get you . . . for snitching on my people. You

watch." (*See id.*, Tr. 8, 10, 13-14). Crawford stated:

> The reason why I didn't tell you all nothing, is I knew once I did, this was going
> to happen. I got tired of lying. I got tired of trying to hide stuff to keep other
> people from getting in trouble.
>
> So I finally said what I told them, and even when I told people what I said, they
> still have (inaudible) in their mind. . . .
>
> ****
>
> . . . .I got people ready to take my head off when I get out.

(*Id.*, Tr. 14-15). When Plummer next asked "Who? Who is it that's going to take your head off,"

Crawford replied: "Gump peoples, the person that did it." (*Id.*, Tr. 15).

In that interview, however, Crawford confirmed, as he had previously told McKinley

Brown, that the "first shot" was "in the house" when Parson was "shot on the couch," and that

Parson was shot a second time "in the head outside on the stairs." (*Id.*, Tr. 17-18). The colloquy

continued in pertinent part as follows:

> CHIEF DAUDISTEL: Okay. Now, you guys drug him outside to the steps,
> right?
>
> MR. CRAWFORD: (Inaudible.)
>
> CHIEF DAUDISTEL: I didn't hear you, what? I'm trying to make sure that what
> you said or what we heard is right. You are in there. You were talking about
> pretty much make it look like a drive by. Am I right or wrong? And then he said
> drag him outside.
>
> MR. CRAWFORD: That was supposed to be his whole little story for everybody.
> That was supposed to be his story for him to be clear.
>
> CHIEF DAUDISTEL: That it was going to be a drive by of some type?
>
> MR. CRAWFORD: Yeah.
>
> CHIEF DAUDISTEL: So who drug him out to the back?

33

> MR. CRAWFORD: I'm not telling you all this, bro. You all got my life in
> danger, man. People trying to kill me, because ever since I came out and I told
> the truth – when I was making up lies, my name – wasn't nobody trying to hurt
> me. Now I start telling the truth, now people want to try to hurt me. That's a rap.

(*Id.*, Tr. 18-19).

Eventually, Crawford said that he believed that Parson was shot because of "money that

he owed," whereas he had "traded a gun for what [he] owed." (*Id.*, Tr. 29, 68). Crawford also

said that although he "told Mack the truth," he left some parts out because "I was still trying to

cover up him, and I really didn't want to put it as him. That's why I told [Mack] about the

mask." (*Id.*, Tr. 27-28, 33).

The next set of statements by Crawford that were introduced at trial occurred in a

recorded conversation on April 17, 2008 between Crawford and Todd Johnson, the father of

murder victim Cameron Parson. Crawford began the conversation by saying, "I don't know

what you heard, or nothing, but I had nothing to do with it. I was there when it happened,

though." (*Id.*, Ex. E, Tr. 2). Crawford told Johnson that Gump killed his son. (*Id.*, Tr. 7, 13).

As he had previously reported to McKinley Brown, Crawford said that Gump came to the

apartment where he, Parson and Peterson were staying and "asked Cameron where is his $100

at"; when "Cam said he didn't have his $100," Gump shot him in the chest. (*Id.*, Tr. 3-4, 10). At

that point, Crawford "started freaking out" and "went in the bathroom and . . . called the police."

(*Id.*, Tr. 4). Crawford stated that Gump made "us take him outside" so that it would look like a

"drive-by" shooting. (*Id.*, Tr. 5). Crawford continued:

> He had us take him out, he put the gun to us. He had us take him outside. . . .
> And then Pat started looking at me and started winking, and then [Gump] shot
> him in the head. That's when he got hit in the head. . . And when [Gump] hit him
> in the head, Pat ran back in the building. When Pat ran back in the building, he
> first went up to Pat, and I took off running.
>
> I had Cam's blood and everything on my shirt and everything. I was sitting there
> holding him when he was sitting on the steps, he was laying on the steps.

(*Id.*, Tr. 6).

Apparently, Crawford changed his story in later statements to Todd Johnson and subsequently to Tamisha Bankston when she visited him on April 24, 2008 at the jail. In his conversation with Johnson, Crawford first said Gump did the shootings, but when Johnson "broke down into tears" and asked Crawford why "you left my son there to die," Crawford changed his story and indicated that "he shot Peterson because Peterson shot Parson." (*See* Doc. 11, Trial Tr. 635-37; *see also* Doc. 16, Ex. E, Tr. 7-9; Doc. 18, Ex. O). Crawford told a "similar story" to Tamisha. (Doc. 11, Trial Tr. 636; *see also* Doc. 18, Ex. O). In a subsequent interview on May 15, 2008 with Plummer, Bob Randolph of the Hamilton County Prosecutor's Office, and Crawford's counsel, Crawford explained that he made up that story because he wanted Cameron's father to think that he did not just let Cameron lay there and die, but rather took action by shooting the person who shot his son. Crawford said he told Tamisha the "same story" because he knew that she talked with Cameron's father. (Doc. 18, Ex. O).

In the May 15, 2008 interview, which appears to have been the last one in which Crawford made statements about what he witnessed on the night of Parson's and Peterson's murders, Crawford relayed essentially the same story that he had told in his third statement to McKinley Brown in October 2007 with a few minor modifications.[7] (*See id.*). Crawford stated that he, Pat, Cam and the dog were in the apartment on the night of September 23, 2007, and that he was the one who answered Gump's knock on the door and allowed Gump into the apartment. There was no gun at first, but when Cam came out of the bathroom, Gump pulled out a gun and demanded his money. Crawford

_____

[7] In a later recorded interview with Officer Roelker on July 24, 2008, Crawford refused to talk when Roelker told Crawford that he would probably be charged with crimes stemming from Parson's and Peterson's murders and suggested that his version of events implicating Gump may be fabricated. (*See* Doc. 16, Ex. G). When Roelker said "I figured you would want to hear what really happened from our point of view," Crawford responded that there was "no need . . . to tell . . . what happened." (*Id.*, Tr. 7). Crawford then ended the interview with the following statement: "The meeting's over with, sir, because I didn't do nothing to nobody, so I am not worried about it. . . . The man involved right there is not going to let me go to prison for something I didn't do. So we can end this right now." (*Id.*).

said the gun was the same one that Gump had taken from him earlier that day. When

Cam said that he had no money, Gump shot Cam, who was sitting on the couch.

Crawford stated that Gump then began "tripping," walking in circles. Gump told

Crawford and Peterson to take Cam outside. When Crawford expressed concern that "the

lady upstairs" was going to "call the police," Gump told him to call the police and report

the shooting as a drive-by. Crawford said he then made the 911 call to report a person

shot outside and that Pat, who was scared and telling Gump to get the gun out of there,

was the one who provided the address to relay to the dispatcher. Crawford said that after

he hung up the phone, Gump pointed the gun at him and Pat and made them carry Cam

outside. Once outside, Gump looked around and then shot Cam in the head. At that

point, Pat looked at Crawford and ran back into the building. Crawford said that Gump

first aimed the gun at him and then chased after Pat. Crawford then fled the scene and

ran to a friend's house. Crawford said he destroyed the shirt he was wearing, which had

Cam's blood on it. As he had reported in all of his prior interviews, Crawford stated that

there was a connection between the murders and the prior burglary of Mario's house

because Gump had demanded $100 from him, "Larry," "Cam," and some "chick" for

their involvement in the burglary.

      Both Plummer and Daudistel testified at trial. Plummer was called as a witness for the

State, and Daudistel was called as a defense witness. Both men acknowledged that, as discussed

above, Crawford told a "number of different stories" about Parson's and Peterson's murders over

the course of the police investigation. (*See* Doc. 11, Trial Tr. 622, 635, 794). Daudistel

indicated that he believed only those statements by Crawford that could be substantiated through

other sources. (*Id.*, Trial Tr. 796-97, 803). Plummer suggested, however, that although

Crawford did not "always tell[] the truth," his statements implicating petitioner in the murders

were credible to the extent that, with only "slight variations," they all "eventually wound up in the same direction pointing toward" petitioner as the person who shot and killed Parson and Peterson. (*See id.*, Trial Tr. 636-39). Moreover, as Plummer pointed out to petitioner in February 2008 when petitioner was finally apprehended and brought to the police station for questioning, petitioner's denial of involvement in the homicides was difficult to believe because by that point in the investigation of the case, Plummer had been "told by so many independent people that there is no way that they could have got together and made this one story come to life, and this one story coming to life all centers around you." (Doc. 16, Ex. B, Tr. 38-39). Plummer presented petitioner with a long list of names of people who had provided testimony against him; the list included not only Crawford, but also Mario Floyd, Tamisha Bankston and several other individuals who did not testify at petitioner's trial. (*See id.*, Tr. 54-55).

Larry DuBose, Brittany Johnson, Antwain Lowe, Antoinette Greene and Shenee Thompson, who did testify at the trial, were not included in the list of names that Plummer recited to petitioner. However, they too implicated petitioner in Peterson's and Parson's murders. DuBose, who went by the name "L-Burner," corroborated Crawford's testimony connecting the murders to the prior burglary of Mario Floyd's house. Specifically, DuBose testified that he participated with Crawford, the murder victims, someone named "Tigger" and "supposedly Tamisha Bankston" in the burglary of Mario's house on August 16, 2007. (Doc. 11, Trial Tr. 421-22). Petitioner called DuBose the same day, saying that "he knew that we were the ones that broke into Mario's house" and that "something has to be done because Mario is upset." (*Id.*, Trial Tr. 424). DuBose arranged to meet petitioner at a park. (*Id.*, Trial Tr. 425). When they met, petitioner demanded "some type of collateral," described as a "hood tax," which "basically pays for . . . protection from anybody that is in that neighborhood or representing that

neighborhood." (*Id.*, Trial Tr. 426). DuBose said that he "gave Gump $100 not to touch me, Patrick Peterson or Cameron Parson." (*Id.*, Trial Tr. 427). Gump accepted the payment, and DuBose thought the matter was resolved until the murders occurred on September 23, 2007. (*Id.*, Trial Tr. 427-28).

DuBose met with the police a few weeks after the homicides. (*Id.*, Trial Tr. 431). He said that the incident on November 4, 2007, which gave rise to the felonious assault charge against petitioner, began with petitioner jumping out of a vehicle and confronting him, accusing him of "snitching," telling the police that "I killed your brothers." (*Id.*). DuBose testified that in the argument that ensued, he asked petitioner "why you let something happen to my brothers, the fact I gave you money to make sure you don't harm any of us." (*Id.*, Trial Tr. 433). Petitioner responded by saying that DuBose's payment "was just for you. That[] wasn't for them, that was for you." (*Id.*).

Antwain Lowe and Brittany Johnson also testified about the altercation between petitioner and DuBose on November 4, 2007. (*See id.*, Trial Tr. 179-185, 470-77). Much of their testimony corroborated DuBose's version of events. Specifically, Johnson testified that she overheard DuBose tell petitioner "I paid you a hundred dollars not to harm them," and that petitioner replied, "no, you paid me a hundred not to kill you." (*Id.*, Trial Tr. 203). Although he was unable to hear what the two men were arguing about, Lowe testified that after the altercation, he asked petitioner "what was that for." (*Id.*, Trial Tr. 477). Petitioner replied that DuBose was "just mad because I murdered his brothers." (*Id.*, Trial Tr. 477-78, 481).

Although petitioner denied that he was involved in the homicides, he himself corroborated portions of Crawford's and DuBose's testimony to the extent that he admitted to the police that he had demanded payment of $100 from the individuals

38

involved in the burglary of Mario Floyd's house and that DuBose had paid him $100 "for not calling the police on them." (Doc. 16, Ex. B, Tr. 32-34, 52 & Ex. C, Tr. 6, 34, 36; *see also* Doc. 11, Trial Tr. 820). Petitioner also admitted that he knew Cameron Parson participated in the burglary and that Parson had told him, "I ain't got no money, I got to break into some cars and get money like." (Doc. 16, Ex. B, Tr. 85 & Ex. C, Tr. 6).

Finally, as the Ohio Court of Appeals pointed out, Antoinette Greene and Shenee Thompson provided additional corroborative testimony implicating petitioner in the homicides that occurred on September 23, 2007. Antoinette Greene, who was petitioner's girlfriend from the fall of 2007 until March 2008, testified that although petitioner first denied any involvement in the murders, he ultimately admitted to her "that he did it." (Doc. 11, Trial Tr. 43-44). Greene, who apparently was crying and visibly upset during her testimony (*see id.*, Trial Tr. 43, 67), stated that petitioner told her he was out driving around with Antwain Lowe and two other women on the night of the murders and that after one of the women was dropped off, he asked Lowe to drop him off in Silverton. (*Id.*, Trial Tr. 44-45, 47-48). As other witnesses similarly testified, Greene stated that after petitioner was dropped off, a fight ensued "over a money issue about the two boys who had owed Gump some money." (*Id.*, Trial Tr. 48-49). Petitioner first told Greene that "Shy" had killed one of the victims, but finally admitted that he shot both boys. (*Id.*, Trial Tr. 50-52). Although Greene indicated during cross-examination that she felt pressured by the prosecution into testifying against petitioner, she consistently stated that she was telling the truth about what petitioner had told her. (*See id.*, Trial Tr. 76-77, 84-86).

Shenee Thompson testified that in the fall of 2007, she overheard petitioner, who was with four other men standing outside drinking and smoking across the street from where she was

sitting on her porch late at night. (*Id.*, Trial Tr. 96-98, 113). Thompson stated that the men started talking loudly and she heard "Cam's name" mentioned and petitioner say, "Yeah, I did it." (*Id.*, Trial Tr. 98-99, 107). Thompson also overheard someone ask petitioner "why would he actually do it" and petitioner reply that "if you go into business with me, don't cross me." (*Id.*, Trial Tr. 106). Petitioner also said that the "boys deserved what they got." (*Id.*, Trial Tr. 106-07). Thompson affirmed that she was "certain" that the statements she had heard "came from Gump." (*Id.*, Trial Tr. 108-09).

Petitioner contends that all of this evidence was insufficient to establish his guilt on the murder charges because the credibility of each witness who testified against him at trial was undermined on the witnesses' cross-examination. Moreover, because there was no evidence presented establishing petitioner's presence at the scene of the murders as contrasted to Crawford, who also made incriminating statements to Thomas Hickey, Todd Johnson and Tamisha Bankston, it is petitioner's position that the evidence tends to show that Crawford was the person who shot and killed Parson and Peterson.

With respect to petitioner's argument challenging the credibility of the witnesses who testified against him at trial, as discussed above and as the Ohio Court of Appeals properly determined in accordance with *Jackson*, 443 U.S. at 318-19 (see Doc. 6, Ex. 10, p. 5), the witnesses' credibility and any conflicts in the evidence were issues "for the trier of fact to decide," not the reviewing court. Furthermore, upon review of the entire record as supplemented by respondent, the undersigned concludes that although the forensic evidence established that Crawford was present when Parson was killed, and although Crawford gave differing accounts to the police and made some incriminating statements during the course of the investigation, a rational trier of fact could have still found that Crawford was not the culpable party and that his statements incriminating petitioner were credible and carried some evidentiary weight to the

extent that in all of his statements, Crawford, like numerous other witnesses, consistently named petitioner as being involved in the murders and that the murders occurred because at least one of the victims failed to pay the $100 demanded by petitioner for participating in the burglary of petitioner's cousin's house.

As petitioner has pointed out, Crawford tried to flee the police and did indicate some culpability to Silverton police officer Thomas Hickey on the day after the murders. However, a rational juror could have inferred that Crawford's attempted flight and incriminating statements given early in the investigation only showed that Crawford was concerned that he might eventually be implicated in the double homicide if it were discovered that he was present at the scene when Cameron Parson was killed and got Parson's blood on his shirt and/or that earlier in the day of the murders, he gave petitioner the revolver used to shoot the two victims. Months later, in April 2008, Crawford also made incriminating statements to Todd Johnson and Tamisha Bankston about killing Patrick Peterson because Peterson had killed Parson. However, the trier of fact could have found those statements lacked credibility because they were made in an apparent effort to appease Parson's father and also lacked any evidentiary support.

Indeed, despite petitioner's contention to the contrary, the forensic evidence (*i.e.*, phone records, as well as evidence observed and collected from the scene of the murders and the victims' autopsies) is consistent with and supports the account that Crawford eventually provided to the police as essentially relaying the "truth" about what happened at the apartment—that Parson was first shot in the chest in the apartment, which did not result in the external loss of much blood, and then carried outside by Parson and Peterson where he was shot in the head; that Crawford's 911 calls were placed after Parson was shot in the chest, but before he was shot in the head and before Peterson was killed; that Crawford's shirt was bloodied from carrying and holding Parson; and that Peterson was next shot and killed inside the apartment building when

attempting to flee from the shooter. A rational trier of fact could also infer that Crawford was not the person who killed Parson given evidence that the two were close friends and, unlike petitioner, had no motive to harm his friend. In fact, in one of the 911 calls that was placed after Parson was first shot, Crawford can be heard pleading with the dispatcher to "please hurry up, [unintelligible] is going to die." (*See* Doc. 18, Ex. K).[8] Finally, as the prosecutor pointed out in closing argument, the trier of fact could reasonably infer that Crawford also did not kill Peterson, because the phone records that were introduced into evidence reveal that Crawford made a phone call to another person that lasted over a minute, during the same period of time that Peterson was being chased and Herman Wallace was reporting in a 911 call that a loud fight was "going on" inside the apartment building. (*See* Doc. 11, Trial Tr. 886-87; *see also* Doc. 16, Ex. M; Doc. 18, Ex. K). In his numerous statements to the police and others, Crawford was unable to report what happened to Peterson after Peterson ran back into the apartment building and even asked in one interview where Peterson's body had been found. Therefore, the trier of fact could reasonably conclude that contrary to his April 2008 statements to Todd Johnson and Tamisha Bankston and in accordance with his later explanation to the police, Crawford did not kill Peterson because Peterson killed Parson and that consistent with his other statements throughout the course of the police investigation, Crawford actually fled the scene and was not present when Peterson was shot and killed.

Accordingly, in sum, the undersigned concludes that petitioner is not entitled to habeas relief based on his claims in Grounds Two and Three challenging the weight and sufficiency of the evidence supporting his convictions for felonious assault and murder. The claim challenging the weight of the evidence, which is alleged in Ground Two of the petition, raises an issue of

---

[8] Petitioner has suggested that Crawford intentionally gave the wrong address to the dispatcher, which shows that he was not acting in Parson's best interest. However, upon review of the 911 call, the undersigned is convinced that Crawford gave the right address, which was relayed to him by Peterson, but that the dispatcher misheard what was said. (*See* Doc. 18, Ex. K).

state-law only that is not cognizable in this federal habeas proceeding. The claim challenging the sufficiency of the evidence, which is alleged in Ground Three, is subject to review on the merits. However, upon thorough review of the trial record, and under the double-layer deferential standard of review that must be applied by this Court, the undersigned concludes that the Ohio Court of Appeals' determination that sufficient evidence was presented at trial to support petitioner's convictions for both the felonious assault of Larry DuBose and the murders of Cameron Parson and Patrick Peterson is neither contrary to nor an unreasonable application of *Jackson*.

**B.  Petitioner Has Waived The Claims In Grounds Four Through Eight Of The Petition Due To His Procedural Default In The State Post-Conviction Proceedings**

In Grounds Four through Seven of the petition, petitioner asserts claims, which if not raised on direct appeal and addressed above, may have been raised as grounds for relief in his state post-conviction petition. (*See* Doc. 1, p. 11 & "Additional Grounds For Relief"; *see also* Doc. 6, Ex. 14). In Ground Eight, petitioner contends that he was deprived of due process when the trial court denied his petition for post-conviction relief without a hearing. (Doc. 1, "Additional Grounds For Relief"). Petitioner asserted that claim as an assignment of error on appeal to the Ohio Court of Appeals from the trial court's ruling. (*See* Doc. 6, Ex. 19). In the return of writ, respondent contends that petitioner procedurally defaulted and has waived the claims presented in Grounds Four through Eight because he did not pursue an appeal to the Ohio Supreme Court from the Ohio Court of Appeals' decision affirming the denial of post-conviction relief. (Doc. 11, Brief, pp. 18-19). Respondent's argument has merit.

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state defendant with federal constitutional claims must fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action. *See* 28

U.S.C. § 2254(b)(1), (c); *see also Anderson v. Harless,* 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971). A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848 (1999); *Hafley v. Sowders,* 902 F.2d 480, 483 (6th Cir. 1990); *Leroy v. Marshall,* 757 F.2d 94, 97, 99-100 (6th Cir. 1985). If the petitioner fails to fairly present his constitutional claims through the requisite levels of state appellate review to the state's highest court, the claims will be deemed procedurally defaulted and waived for purposes of federal habeas review absent a showing of cause for and prejudice from the default or that a fundamental miscarriage of justice will occur if the claims are not considered by this Court. *See O'Sullivan,* 526 U.S. at 847-48; *Leroy v. Marshall,* 757 F.2d at 97, 99-100; *see also Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Harris v. Reed,* 489 U.S. 255, 262 (1989); *Murray v. Carrier,* 477 U.S. 478, 485 (1986).

As respondent has argued, petitioner procedurally defaulted the claims alleged in Grounds Four through Eight of the petition because he did not provide the Ohio Supreme Court with an opportunity to consider the claims that were raised in the state post-conviction proceedings. Petitioner did not pursue a timely appeal to the Ohio Supreme Court from the Ohio Court of Appeals' July 18, 2012 decision affirming the trial court's judgment (*see* Doc. 11, Ex. B) and is not permitted at this late juncture to seek a delayed appeal to the state's highest court in the matter involving a petition for post-conviction relief. *See* Ohio S.Ct. Prac. R. 7.01(A)(4)(c). Therefore, this Court's review of any constitutional claims alleged in Grounds Four through Eight is barred unless petitioner can demonstrate both cause for and prejudice from his procedural default in the state courts or that failure to consider the defaulted claims will result in a fundamental miscarriage of justice. *See Coleman,* 501 U.S. at 750.

Petitioner has neither argued nor presented any evidence establishing cause for his

procedural default in this case. Moreover, petitioner has not demonstrated that failure to consider the issues that were presented in the state post-conviction proceedings will result in a "fundamental miscarriage of justice," or in other words, that the alleged errors "probably resulted in the conviction of one who is actually innocent." *See Murray*, 477 U.S. at 495-96; *see also Schlup v. Delo*, 513 U.S. 298, 327 (1995). Although petitioner has challenged the weight and sufficiency of evidence supporting his convictions, actual innocence means factual innocence, not mere legal insufficiency. *See House v. Bell*, 547 U.S. 518, 538 (2006); *Carter v. Mitchell*, 443 F.3d 517, 538 (6th Cir. 2006) (citing *Bousley v. United States*, 523 U.S. 614, 623 (1998)); *Wright v. Lazaroff*, 643 F. Supp.2d 971, 989 (S.D. Ohio 2009) (Barrett, J.; Hogan, M.J.); *see also Vanwinkle v. United States*, 645 F.3d 365, 369 (6th Cir. 2011).

To establish a credible claim of actual innocence sufficient to overcome a procedural bar to review, the petitioner must demonstrate that "in light of new evidence, 'it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 536-37 (quoting *Schlup*, 513 U.S. at 327); *cf. Souter v. Jones*, 395 F.3d 577, 602 (6th Cir. 2005); *McSwain v. Davis*, 287 F. App'x 450, 458 (6th Cir. 2008). The standard is "demanding and permits review only in the 'extraordinary' case." *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327). To be credible, a claim of actual innocence must be based on "new reliable evidence . . . that was not presented at trial." *House*, 547 U.S. at 537 (quoting *Schlup*, 513 U.S. at 324); *see also Calderon v. Thompson*, 523 U.S. 538, 559 (1998).

Petitioner has not established a credible claim of actual innocence in this case. In support of his claims for state post-conviction relief, petitioner attached the following exhibits to his petition: (1) a letter from Desmond Turner about being approached by Bruce Plummer and the prosecution and their purported offer to help obtain a reduction in Turner's sentence if Turner would assist them in the prosecution of petitioner; (2) an affidavit and letter from Tamisha

45

Bankston regarding Crawford's confession to her that he killed Peterson because Peterson shot

Parson and her alleged harassment by "Lt. Plummer" and "a prosecutor" during the investigation

of the case; and (3) an affidavit by "Shanay Thompson," in which Thompson stated that she

testified at trial "point[ing] the blame at Devorous out of fear" of losing her children and

indicated that she provided "untruthful" testimony and "honestly [is] not sure who shot who."

(*See* Doc. 6, Ex. 14, attached Exhibits A-D). Turner's letter and the allegations of harassment by

the police and prosecutors made in the various exhibits do not contain any information pertaining

to the actual shooting incident and, therefore, do not constitute evidence of actual innocence.

Crawford's confession to Tamisha Bankston that he killed Peterson because Peterson killed

Parson was discussed at trial and was part of the record considered by the trial court in reaching

its verdict. Therefore, it cannot be relied on as "new evidence" of actual innocence, which is

required to excuse his procedural default. *See, e.g., House,* 547 U.S. at 537; *Calderon,* 523 U.S.

at 559; *Schlup,* 513 U.S. at 324. Finally, petitioner has not demonstrated a colorable case of

actual innocence to the extent that Thompson, who testified at trial that the spelling of her name

is "Shenee," indicated that her trial testimony against petitioner was "untruthful" and that she did

not know who killed Parson and Peterson. Thompson was only one of many witnesses who

provided testimony implicating petitioner in the homicides. Even assuming the statements

contained in her affidavit constitute a recantation of her trial testimony, such evidence is

insufficient to show "'it is more likely than not that no reasonable juror would have found

[petitioner] guilty beyond a reasonable doubt.'" *House,* 547 U.S. at 536-37 (quoting *Schlup,* 513

U.S. at 327).

Accordingly, in sum, the undersigned concludes that petitioner procedurally defaulted

any claims alleged in Grounds Four through Eight of the petition that were asserted as grounds

for relief in the state post-conviction proceedings, because he did not pursue an appeal to the

Ohio Supreme Court in those proceedings. Petitioner has not demonstrated cause for his procedural default or that a fundamental miscarriage of justice will occur if the claims alleged in Grounds Four through Eight are not considered by this Court. Therefore, the grounds for relief should be denied with prejudice as waived.

**IT IS THEREFORE RECOMMENDED THAT:**

1. Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** with prejudice.

2. A certificate of appealability should not issue with respect to the claims alleged in Grounds Four through Eight, which this Court has concluded are waived and thus procedurally barred from review, because under the first of the applicable two-part standard enunciated in *Slack v. McDaniel,* 529 U.S. 473, 484-85 (2000), "jurists of reason" would not find it debatable whether this Court is correct in its procedural ruling.[9]

A certificate of appealability also should not issue with respect to the non-defaulted claims alleged in Grounds One through Three of the petition except to the extent that the Court should issue a certificate of appealability with respect to the portion of Ground Three challenging the sufficiency of the evidence supporting petitioner's murder convictions, which is "adequate to deserve encouragement to proceed further." *See Slack,* 529 U.S. at 475 (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3. With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation to deny relief based on petitioner's claim in Ground Three challenging the sufficiency of the evidence supporting his murder convictions would be taken in

---

[9]Because the first prong of the *Slack* test has not been met, the Court need not address the second prong of *Slack* as to whether "jurists of reason" would find it debatable whether petitioner has stated a viable constitutional claim in the defaulted grounds for relief. *See Slack,* 529 U.S. at 484.

"good faith" and, therefore, should **GRANT** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).


Date: 5/16/14

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DEVOROUS HENDRICKS,                       Case No. 1:12-cv-213
    Petitioner

    vs.                                   Barrett, J.
                                          Litkovitz, M.J.

WARDEN, LEBANON
CORRECTIONAL INSTITUTION,
    Respondent


## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations. This period may be extended further by the Court on

timely motion for an extension. Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections. If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs. A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in

accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

cbc